UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,     CRIM NO. 15-210 (MJD/JSM)

   Plaintiff,

v.                            REPORT AND RECOMMENDATION

ADAN MARGRITOS FLORES-LAGONAS (4)

   Defendant.


The above matter came before the Court upon defendant's Motion for Suppression of Evidence [Docket No. 93]. Surya Saxena, Assistant United States Attorney, appeared on behalf of the Government. Kurt Glaser, Esq. appeared on behalf of defendant, who was personally present. The matter has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

**I.    FACTUAL BACKGROUND**

   **A.    Hearing Testimony**

On October 14, 2015, the Court conducted an evidentiary hearing and took testimony from Officer Brian Green of the Rochester Police Department and Sergeant James Schueller of the Olmsted County Sheriff's Office.

   **1.    Officer Brian Green**

Officer Green testified that on May 13, 2015, he was involved in the response to a controlled delivery of narcotics in the parking lot of Dick's Sporting Goods in Rochester, Minnesota. Officer Green was conducting surveillance with three other law enforcement officers in an unmarked squad vehicle driven by Inspector Redding. The

squad vehicle was parked in a partially concealed location around the corner of the store.  From this location, Officer Green was unable to see the store's parking lot, but he was continuously receiving information from other law enforcement officers via radio and telephone.

While Officer Green was conducting surveillance in his squad vehicle, he was informed by another surveillance team that a cooperating individual ("CI") was meeting with a male suspect at the CI's vehicle located in the Dick's Sporting Goods parking lot for the purpose of the CI delivering some methamphetamine to the suspect.  Officer Green was also advised that the suspect had previously been seen conversing with the occupants of a blue Chrysler Pacifica, which was located in the parking lot.  After meeting with the suspect at the CI's vehicle, Officer Green was informed that the CI had entered the store while the suspect remained near the CI's vehicle, and then the suspect was observed walking towards the blue Pacifica.  At that time, Officer Green and his team were ordered to arrest the suspect and the occupants of the Pacifica.

As Inspector Redding pulled his squad vehicle into the parking lot to execute the arrest,[1] Officer Green saw the suspect standing right next to the Pacifica.  Inspector Redding stopped his vehicle 10 to 20 feet from the Pacifica, and the four officers exited with weapons drawn.  Officer Green and his team were wearing black tactical vests with the word "Police" displayed across the front in large white letters and the word "Narcotics" on the back of the vests.  Officer's Green's police badge was also attached to his tactical vest.  Upon seeing the officers, the suspect immediately took off running

---

[1] Officer Green could not recall if Inspector Redding's squad vehicle was equipped with emergency lights or sirens.  Even if it was, Officer Green testified that this equipment was not activated at any time during the arrest.

through the parking lot. Officer Green yelled, "Stop, police!" to both the suspect and persons in the car.[2] Officer Green believed that the occupants saw the officers and heard the directive to stop. Rather than stopping, the Pacifica accelerated southbound through the parking lot and collided with an unmarked squad vehicle driven by Sergeant Schueller. The Pacifica did not stop after the collision but instead continued southbound out of the parking lot with several police surveillance vehicles in pursuit. Officer Green stated that, in fleeing the scene, the Pacifica committed several traffic violations, including reckless driving and leaving the scene of a collision with an attended vehicle.

On cross examination, Officer Green testified that, prior to the stop, he had not witnessed the Pacifica commit any traffic violations. Officer Green also stated that when officers raised up their service weapons, it was possible that the word "Police" was blocked from view. Officer Green further testified that the Pacifica's engine was probably running when he yelled for it to stop.

### 2. Sergeant James Schueller

On May 13, 2015, Sergeant Schueller and his partner were assigned as a surveillance vehicle in connection with a controlled delivery of narcotics in the Dick's Sporting Goods parking lot. Sergeant Schueller's vehicle was an unmarked Jeep Grand Cherokee, which was equipped with an emergency light bar that could be mounted in the windshield. The vehicle did not have a siren.

While the CI was conversing with an unidentified suspect in the Dick's Sporting Goods parking lot, Sergeant Schueller saw a dark blue 2005 Pacifica drive past the CI

---

[2]   Officer Green testified that he saw two individuals in the Pacifica, but he was unable to identify them at the time.

and park approximately three rows to the north. From this location, the Pacifica had a clear view of the CI and the suspect. According to Sergeant Schueller, the Pacifica's movements seemed odd in comparison to other traffic, as the Pacifica drove very slowly and parked in the middle of the lot, away from other vehicles. Sergeant Schueller also recalled that, earlier in the day, other surveillance units had seen a blue Pacifica in the area. Sergeant Schueller then saw the suspect walk away from the CI's vehicle in the direction of the blue Pacifica. At that time, Sergeant Schueller was ordered to assist in arresting the suspect and the Pacifica's occupants.

As Sergeant Schueller approached the scene, he saw that the primary arrest vehicle was stopped near the front passenger area of the Pacifica. According to Sergeant Schueller, at least two of the members of the primary arrest team were wearing marked tactical vests. Sergeant Schueller positioned his squad vehicle approximately 10 to 15 feet from the front driver's side bumper to prevent the Pacifica from leaving the scene. The driver of the Pacifica turned and saw Sergeant Schueller, gave a look of surprise, and immediately accelerated forward. The Pacifica swerved and struck Sergeant Schueller's squad vehicle as it moved past. Sergeant Schueller testified that the contact was very loud and shook his vehicle.

The Pacifica continued southbound through the parking lot and nearly hit a member of the primary arrest team who was wearing a marked tactical vest. The Pacifica then left the parking lot and headed south on Main Avenue. Sergeant Schueller initiated pursuit of the Pacifica by activating his hazard lights and sounding the horn. Sergeant Schueller also radioed for marked squad vehicles. At the end of Main Avenue, the Pacifica turned right onto 48th Street where it made several evasive

maneuvers and swerved in and out of traffic.  As Sergeant Schueller followed the Pacifica on to 48th Street, his partner mounted the emergency light bar in the windshield.  Sergeant Schueller continued to pursue the Pacifica on 48th Street, reaching speeds of up to 90 miles per hour.  The speed limit in this area was 55 miles per hour.  On five or six occasions during the pursuit, Sergeant Schueller saw the driver of the Pacifica extend his arm out of the window and drop a white powdery substance onto the road.

Eventually, the Pacifica came to a T-intersection and attempted to turn right onto County Road 8.  As the Pacifica accelerated into the turn, it skidded off the road and went down an embankment.  The vehicle rolled approximately 15 to 20 feet into an open field where it finally came to a stop.  Sergeant Schueller parked his squad vehicle on the side of County Road 8, and both he and his partner approached the Pacifica on foot.  Sergeant Schueller saw that the driver of the Pacifica had exited the vehicle.  As the driver reached the rear bumper of the Pacifica, he turned and looked back at Sergeant Schueller, who had his weapon drawn and his police badge displayed around his neck.  Sergeant Schueller identified himself as law enforcement and commanded the driver to stop, but the driver fled on foot.  Sergeant Schueller pursued the driver and stopped him a short distance from the Pacifica.  The driver was placed under arrest. Sergeant Schueller conducted a pat-down search of the driver and discovered two loaded handgun magazines.  Officers then searched the Pacifica and discovered a black handgun and a loaded magazine.  The driver was later identified as defendant Adan Flores-Lagonas.

B.   **Motion to Suppress and Government Response**

In support of his motion to suppress, defendant argued that police lacked reasonable suspicion to support a Terry stop of his vehicle in the Dick's Sporting Goods parking lot on May 13, 2015. Post-Hearing Memorandum in Support of Defendant's Motion for Suppression of Evidence, pp. 1-2 [Docket No. 108]. Defendant asserted that the officers' attempt to arrest him was based on the orders of another police officer, rather than any observed suspicious activity, and therefore, the stop was illegal under Terry v. Ohio, 392 U.S. 1 (1968). Id., p. 2. According to defendant, any evidence obtained by police after the initial stop must be suppressed as fruits of an illegal arrest. Id. Defendant further contended that his action of leaving the parking lot was reasonable "under the unusual circumstances" that the officers did not properly identify themselves as police. Id. Defendant noted that officers were wearing plain clothes and both squad cars used in the arrest attempt were unmarked. Id., pp. 2-3. Additionally, because officers had raised their arms to aim their weapons at him, defendant posited that their arms would have blocked or obscured the word "Police." Id., p. 3. Therefore, defendant asserted he would not have known that he was encountering law enforcement officers, rather than just people approaching him with guns raised. Id. Defendant also argued that it was unreasonable for Officer Green to believe that the driver of the Pacifica could hear or understand Officer Green's orders to stop, as the Pacifica's windows were closed, the engine was running, and Officer Green was 10 to 20 feet away when he shouted, "Stop, police!" Id.

Lastly, defendant submitted that under Minnesota law, he did not commit the offense of fleeing a peace officer, leaving the scene of a collision, or careless driving,

and therefore, there was no basis for law enforcement to stop him for any traffic violations. Id., pp. 4-6. Specifically, defendant asserted that at the time law enforcement approached him in the Pacifica, the officers were in unmarked cars without emergency lights, and the word "Police" on their tactical vests was likely obscured when they raised their firearms at him. Id., p. 4. Consequently, when he fled, he would not have known that he was being pursued by law enforcement; instead, he reasonably left the scene and collided with an unmarked police car in an attempt to escape or defend himself from an assault by persons with guns drawn. Id., pp. 4-5. Likewise, defendant contended he did not unlawfully leave the scene of a collision in violation of Minn. Stat. § 169.09, subd. 2, because the statute required only that he stop "'as close to the collision as possible' in order to fulfill the requirement of exchanging insurance information," and if he did not provide the insurance information at the scene of the collision, the statute permitted him to produce his insurance information within 72 hours of the collision. Id., pp. 5-6 (citing Minn. Stat. § 169.09, subd. 3(b)). Because police did not clearly identify themselves, defendant urged that it was reasonable for him to seek safety before stopping and fulfilling his insurance exchange requirement, and accordingly, the officers were not reasonable in believing that he needed to stop his car to fulfill the requirements of Minn. Stat. § 169.09. Id., p. 6.

As for any suggestion that it was proper for law enforcement to stop him for careless driving, defendant argued that there was no testimony by the officers that they were worried that his driving would endanger anyone, as required by Minn. Stat. § 169.15, subd. 2. Id.

In response, the Government contended that the totality of the circumstances during the controlled delivery of narcotics supported a reasonable suspicion that defendant was involved in drug trafficking. Post-Hearing Response to Defendant Flores-Lagonas's Motion to Suppress Evidence, pp. 6-7 [Docket No. 112] (citing United States v. Bustos-Torres, 396 F.3d 935, 939-40, 942 (8th Cir. 2005); United States v. Spotts, 275 F.3d 714, 716-17 (8th Cir. 2002); United States v. Williams, 139 F.3d 628, 629-30 (1998)). The Government also asserted that the pursuit and subsequent search of defendant was independently justified by his attempt to flee police officers in his motor vehicle and by his refusal to obey police orders to stop. Id., pp. 8-10 (citing Minn. Stat. § 609.487; United States v. Smith, 789 F.3d 923, 929 (8th Cir. 2015); United States v. Blackmon, 662 F.3d 981, 985-86 (8th Cir. 2011); United States v. Sledge, 460 F.3d 963, 966 (8th Cir. 2006)). Additionally, the Government submitted that, during the course of flight, defendant violated several state traffic laws, including Minn. Stat. § 169.13, subd. 1 (reckless or careless driving), Minn. Stat. §169.09, subd. 2 (requiring a driver involved in a collision to stop immediately and remain at the scene), and Minn. Stat. § 169.14 (speeding), which gave officers further cause to believe he was involved in criminal conduct. Id., pp. 11-12. Finally, the Government argued that even if law enforcement officers had no lawful basis to stop or pursue defendant, defendant could not challenge the subsequent search of his vehicle, because he had abandoned it by running away. Id., pp. 12-13 (citing United States v. Smith, 648 F.3d 654, 660 (8th Cir. 2011)).

**II.     DISCUSSION**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it requires probable cause for lawful searches and seizures. U.S. Const. amend. IV; see also Illinois v. Gates, 462 U.S. 213, 230, 235 (1983). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Vore, 743 F.3d 1175, 1179 (8th Cir. 2014) (quoting Katz v. United States, 389 U.S. 347, 357 (1967) (footnote omitted)).

"'The Fourth Amendment permits an investigative stop of a vehicle if officers have a reasonable suspicion the vehicle or its occupants are involved in criminal activity.'" United States v. Williams, 796 F.3d 951, 957 (8th Cir. 2015) (quoting United States v. Bell, 480 F.3d 860, 863 (8th Cir. 2007)); see also United States v. Roberts, 787 F.3d 1204, 1209 (8th Cir. 2015) ("A police officer may conduct an investigative stop if she 'has a reasonable suspicion supported by articulable facts that criminal activity may be afoot.'") (quoting United States v. Robinson, 670 F.3d 874, 876 (8th Cir. 2012)). "If police have reasonable suspicion, they 'may briefly stop an individual and make reasonable inquiries aimed at confirming or dispelling the suspicion.'" Williams, 796 F.3d at 957 (quoting United States v. Hughes, 517 F.3d 1013, 1016 (8th Cir. 2008)).

"Reasonable suspicion must be supported by more than a 'mere hunch,' but 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard.'"

Roberts, 787 F.3d at 1209 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)). "In determining whether reasonable suspicion exists, we consider the totality of the circumstances in light of the officers' experience and specialized training." United States v. Preston, 685 F.3d 685, 689 (8th Cir. 2012) (quoting United States v. Davis, 457 F.3d 817, 822 (8th Cir. 2006)). Further, "[t]he collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." United States v. Thompson, 533 F.3d 964, 969 (8th Cir. 2008) (citing United States v. Williams, 429 F.3d 767, 771-72 (8th Cir. 2005)).

"If, however, the officers conduct an illegal search or detention, physical evidence from the search as well as verbal evidence obtained from the detention must be excluded as the 'fruits' of the officers' unlawful action." United States v. Cotter, 701 F.3d 544, 547 (8th Cir. 2012) (citing Wong Sun v. United States, 371 U.S. 471, 484-85 (1963)).

Based on the above principles, the Court finds that the initial stop of defendant's vehicle on May 13, 2015 was justified, because law enforcement officers had reasonable suspicion to believe that the occupants of the Pacifica were involved in criminal activity. Officers had arranged for a controlled delivery of narcotics between a CI and an unknown suspect in the Dick's Sporting Goods parking lot. Prior to the controlled delivery, officers informed Officer Green that they had observed the suspect speaking with the occupants of a blue Chrysler Pacifica that had been observed in the area earlier in the day. Further, as the suspect was seen conversing with the CI at the

CI's car, Sergeant Schuller observed the Pacifica drive slowly past the CI and park in a location away from other vehicles, but with a clear line of sight to the CI and the suspect. Sergeant Schueller, an experienced narcotics investigator, found the Pacifica's movements to be strange compared to other vehicles in the parking lot. Sergeant Schueller then saw the suspect walk away from the CI's vehicle in the direction of the Pacifica. By the time officers arrived at the scene, the suspect was standing right next to the Pacifica, further confirming its occupants' connection with the suspect and the controlled delivery of narcotics by the CI to the suspect. Based upon the information communicated to Officer Green by other law officers prior to his approach to the Pacifica, which was confirmed by the observations of Sergeant Schueller in the Dick's Sporting Goods parking lot, Officer Green and his team reasonably suspected that the occupants of Pacifica were involved in criminal activity associated with the controlled delivery of narcotics between the CI and unnamed suspect. Accordingly, under the totality of the circumstances, Officer Green and his team were justified in conducting a stop of defendant's Pacifica to investigate whether it was, in fact, involved in narcotics trafficking activity.

However, even if officers lacked reasonable suspicion to support the stop of defendant's vehicle, the Court finds that defendant's attempt to flee from law enforcement and subsequent traffic violations provided an independent basis for the pursuit and arrest of defendant.

"'[A] defendant's response to even an invalid arrest or Terry stop may constitute independent grounds for arrest.'" Blackmon, 662 F.3d at 985-86 (citation omitted); see also Sledge, 460 F.3d at 966 ("'In our circuit, resistance to an illegal arrest can furnish

11

grounds for a second, legitimate arrest.'") (citations omitted). "'When a defendant commits a new and distinct crime during an unlawful detention, the Fourth Amendment's exclusionary rule does not bar evidence of the new crime.'" Sledge, 460 F.3d at 966 (quoting United States v. Hunt, 372 F.3d 1010, 1012 (8th Cir. 2004)). "'A contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct.'" United States v. Schmidt, 403 F.3d 1009, 1016 (8th Cir. 2005) (quoting United States v. Bailey, 691 F.2d 1009, 1017 (11th Cir. 1982)).

Under Minnesota law,

> Whoever by means of a motor vehicle flees or attempts to flee a peace officer who is acting in the lawful discharge of an official duty, and the perpetrator knows or should reasonably know the same to be a peace officer, is guilty of a felony and may be sentenced to imprisonment for not more than three years and one day or to payment of a fine of not more than $5,000, or both.

Minn. Stat. § 609.487, subd. 3 (2011). The term "flee" means "to increase speed, extinguish motor vehicle headlights or taillights, refuse to stop the vehicle, or use other means with intent to attempt to elude a peace officer following a signal given by any peace officer to the driver of a motor vehicle." Minn. Stat. § 609.487, subd. 1 (2011).

Additionally, Minn. Stat. § 609.487, subd. 6, provides:

> Whoever, for the purpose of avoiding arrest, detention, or investigation, or in order to conceal or destroy potential evidence related to the commission of a crime, attempts to evade or elude a peace officer, who is acting in the lawful discharge of an official duty, by means of running, hiding, or by any other means except fleeing in a motor vehicle, is guilty of a misdemeanor.

In this case, defendant clearly attempted to flee from law enforcement officers after they ordered him to stop his vehicle in the Dick's Sporting Goods parking lot.

12

Although defendant maintained that the officers did not properly identify themselves as law enforcement, this claim is purely speculative and lacks any evidentiary support. To the contrary, Officer Green testified that upon exiting Inspector Redding's vehicle, the four officers approached the Pacifica with their weapons drawn, and Sergeant Schueller and Officer Green stated that the officers were wearing marked tactical vests with the word "Police" clearly displayed across the front. Further, upon arriving at the scene, Officer Green shouted "Stop, police!" and defendant made eye contact with both Officer Green and Sergeant Schueller prior to leaving the parking lot. Under these circumstances, a reasonable person would have known that he was being stopped by law enforcement, and thus, officers had probable cause to arrest defendant for the crime of fleeing a peace officer. See United States v. Loveland, Crim. No. 07-438 (JRT/JJG), 2008 WL 3200648, at *4 (D. Minn. Aug. 5, 2008) ("So if a person flees from an unlawful stop, the crime of fleeing from the officer supplies probable cause to arrest that person, who forfeits the right to challenge the prior unlawful stop.") (citing Sledge, 460 F.3d at 966-67).

Further, following the high-speed pursuit, Sergeant Schueller also had probable cause to arrest defendant for fleeing on foot, in violation of Minn. Stat. § 609.487, subd. 6. After the Pacifica had skidded off the road and stopped in an open field, defendant exited his vehicle and looked back at Sergeant Schueller, who was wearing his police badge. Sergeant Schueller identified himself as law enforcement and ordered defendant to stop, but defendant attempted to run away on foot. As such, Sergeant Schueller had probable cause to arrest defendant for violating Minn. Stat. § 609.487, subd. 6.

In addition to flight, law enforcement had probable cause to arrest defendant for failing to stop after a collision and for engaging in conduct that amounted to reckless or careless driving.

Under Minn. Stat. § 169.09, subd. 2 (2014),

> The driver of any motor vehicle involved in a collision shall immediately stop the motor vehicle at the scene of the collision, or as close to the collision as possible, and reasonably investigate what was struck. If the driver knows or has reason to know the collision involves damage to a vehicle driven or attended by another, the driver in every event shall remain at the scene of the collision until the driver has fulfilled the requirements of this section as to the giving of information.

Here, defendant struck Sergeant Schueller's squad vehicle while he was attempting to leave the Dick's Sporting Goods parking lot. According to Sergeant Schueller, the contact was extremely loud and shook his vehicle. However, defendant did not stop at the scene of the collision or anywhere near it. Consequently, officers had probable cause to arrest defendant for a violation of Minn. Stat. § 169.09, subd. 2.

Defendant's argument that it was reasonable to seek safety prior to stopping his vehicle, as Sergeant Schueller did not clearly identify himself as law enforcement, is meritless. Minn. Stat. § 169.02, subd. 2, is not limited to stopping after a collision with law enforcement. It applies to any collision with anybody. In any event, Sergeant Schueller testified that his partner installed the emergency light bar in the windshield of his vehicle as soon as he turned onto 48th Street from Main Avenue, and thus, defendant's contention that he did not know he had hit a law enforcement vehicle is without evidentiary support.

With regard to reckless driving, Minnesota law provides:

> A person who drives a motor vehicle while aware of and consciously disregarding a substantial and unjustifiable risk that the driving may result in harm to another or another's property is guilty of reckless driving. The risk must be of such a nature and degree that disregard of it constitutes a significant deviation from the standard of conduct that a reasonable person would observe in the situation.

Minn. Stat. § 169.13, subd. 1(a) (2008). "Careless driving" is defined as "operat[ing] or halt[ing] any vehicle upon any street or highway carelessly or heedlessly in disregard of the rights of others, or in a manner that endangers or is likely to endanger any property or any person, including the driver or passengers of the vehicle . . . ." Minn. Stat. § 169.13, subd. 2 (2008).

In this case, Sergeant Schueller saw defendant's Pacifica engage in several maneuvers likely to endanger or harm another person or property, including the driver and passenger of the vehicle. Sergeant Schueller testified that the Pacifica collided with his squad vehicle while attempting to flee from law enforcement in the Dick's Sporting Goods parking lot. Then, instead of stopping, the Pacifica continued southbound out of the parking lot and nearly hit a member of the primary arrest team who was wearing a marked tactical vest. Sergeant Schueller pursued the Pacifica out of the parking lot and observed it swerving in and out of traffic and reaching speeds of 90 miles per hour in a 55 mile-per-hour zone. All of these observations provided probable cause for Sergeant Schueller to arrest defendant for careless or reckless driving under Minn. Stat. § 169.13, subd. 1 and 2.

For all of these reasons, the Court concludes that even if officers lacked reasonable suspicion to support the initial stop of defendant in the Dick's Sporting

Goods parking lot, his commission of new and distinct offenses provided independent probable cause for an arrest.[3]

In summary, officers had reasonable suspicion to stop and investigate defendant's vehicle for narcotics trafficking activity based on defendant's apparent connection with the suspect involved in a controlled drug transaction in the Dick's Sporting Goods parking lot. Further, even if officers lacked reasonable suspicion to support a Terry stop, defendant's attempt to evade law enforcement, failure to stop after a collision, and driving conduct in and after he fled the parking lot, provided independent probable cause for an arrest. Accordingly, any evidence obtained from defendant's person and his vehicle should not be suppressed.

### III. RECOMMENDATION

For the reasons set forth above, IT IS HEREBY RECOMMENDED that

Defendant's Motion for Suppression of Evidence [Docket No. 93] be **DENIED**.


Dated: November 12, 2015

                                                         *s/ Janie S. Mayeron*
                                                        JANIE S. MAYERON
                                                        United States Magistrate Judge

---

[3] While not addressed by the parties, the Court notes that defendant's behavior during the high-speed pursuit supplied additional justification for a Terry stop. Sergeant Schueller testified that defendant, on several occasions, extended his arm out of the window and dropped a white, powdery substance on to the road. This behavior, coupled with defendant's contact with the suspect involved in the controlled narcotics transaction and attempt to flee from law enforcement, further supported the reasonable belief that defendant was involved in narcotics trafficking activity. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

## **NOTICE**

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **November 30, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.